UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EMILY HARDING, on behalf of herself and all others similarly situated, | ) ) | CASE NO.  1:21-cv-1212 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| STEAK N SHAKE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Before this Court is Plaintiffs' Motion for partial summary judgment. (Doc. No. 83.)

Defendant Steak N Shake, Inc. ("Steak N Shake") opposed the motion (Doc. No. 86), and

Plaintiffs replied in support (Doc. No. 90.)  For the following reasons, the motion is GRANTED

in part and DENIED in part.

## I.    BACKGROUND

### A.  Factual Background

Steak N Shake is a restaurant that offered a full-service dining experience[1] with locations

across the United States.  (Doc. No. 15-1 at 188, ¶¶ 24-25.)[2]  Plaintiffs are servers who worked at

Ohio Steak N Shake restaurants for at least one week in the three years prior to the Court

granting conditional certification.  (*Id.* at 187, ¶¶ 13-15; Doc. No. 56 at 999.)  Plaintiffs allege

they were not fully compensated for two types of work they performed while employed by Steak

---

[1] Starting in May 2020, Steak N Shake "no longer employed servers," and "eliminat[ed] table service, [] only offering customers the option of completing their orders via drive-thrus, for delivery, or for curbside service."  (Doc. No. 86 at 1745.)

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

N Shake: (1) work unrelated to their duties as servers ("unrelated work"), and (2) work that did not generate tips but was related to their duties as servers ("tip-supporting work") in violation of the Fair Labor Standards Act ("FLSA").

### 1.  Servers' Duties and Tasks

Regarding unrelated work, Plaintiffs claimed that they worked "as essentially janitors and cooks for $4.00 an hour."  (Doc. No. 84 at 1246.)  In support of these claims, Plaintiffs introduced two corporate policies.  The first policy is a list of servers' "Daily Sidework Duties." (Doc. No. 84-1 at 1278-84.)  This policy required servers to complete tasks such as "polish all stainless rails," "wipe down front door frames, shine stainless kick plates and frames," "sweep and mop service station," and "empty trash in service station."  (*Id.*)  The second policy is a "Server Task Outline," which required servers to clean coffee carafes by hand and "clean counters, shelving, and stainless [rails] with moist sanitized towels."  (*Id.* at 1285-86.)  Steak N Shake managers and a corporate representative testified that each location was required to comply with both policies.  (Doc. No. 84-3 at 1348-49; *see also* Doc. No. 84-4 at 1414-15; Doc. No. 84-5 at 1489, 1494.)

Plaintiffs also testified that they completed cleaning tasks not described in the Daily Sidework Duties or Server Task Outline during their shifts.  (*See* Doc. No. 84-7 at 1580, 1584, 1599; *see also* Doc. No. 84-8 at 1631-32, 1655-56, 1657.)  Steak N Shake managers corroborated this testimony, stating that servers cleaned bathrooms, swept and mopped floors beyond the service station, washed and polished silverware, cleaned doors and windows, and washed dishes. (Doc. No. 84-3 at 1338, 1353, 1357-58, 1344; Doc. No. 86-2 at 1793, 1850; Doc. No. 84-4 at 1410, 1425, 1428.)

In addition to cleaning and maintenance, servers assisted with food production by making milkshakes, coleslaw and salads.  (*See* Doc. No. 84-3 at 1344, 1363, 1365; Doc. No. 86-2 at 1793-94, 1849; Doc. No. 84-4 at 1411; Doc. No. 84-7 at 1580, 1584, 1597-98; Doc. No. 84-8 at 1631, 62, 1656.)  With respect to milkshakes, managers testified that some restaurants assigned a specific employee to make milkshakes during certain shifts.  (Doc. No. 86-2 at 1797, 1799.)  Managers also testified that sometimes servers made milkshakes voluntarily when they were "impatient" or sought better tips.  (*Id.* at 1794; Doc. No. 84-3 at 1344, 1365, 1370.)  Plaintiffs also testified that they operated the grill "more than on occasion" and during morning shifts.  (Doc. No. 84-7 at 1584; Doc. No. 84-8 at 1656.)

Regarding tip-supporting work, Plaintiffs claimed that they spent over 20% of their shifts performing tasks that "do not generate tips but, nevertheless, are still related to the job of a tipped employee."  (Doc. No. 84 at 1250.)  As listed on the Daily Sidework Duties, Plaintiffs' tasks included tidying and setting tables, making tea and coffee, rolling silverware, refilling condiments, cleaning booths, and stocking paper supplies. (*See* Doc. No. 84-1 at 1278-84.)  The Server Task Outline likewise listed a number of tip-supporting tasks, such as stocking drinks, condiments, and paper products, stocking and storing silverware, and mopping spills and cleaning the dining area.  (*See id.* at 1285-86.)  Plaintiffs, managers, and Steak N Shake's corporate representative testified that these tasks were part of a server's typical responsibilities.  (*See* Doc. No. 84-3 at 1346-48, 1354-55, 1364; Doc. No. 84-4 at 1414, 1416-17, 1440, 1428, 1442-43; Doc. No. 84-5 at 1491-92, 1494; Doc. No. 84-7 at 1575, 1581; Doc. No. 84-8 at 1631-32, 1636-37, 1644, 1651.)

### 2. Steak N Shake Dual Jobs Policy and Timekeeping

Steak N Shake maintained a human resources policy regarding "dual jobs." (*See* Doc. No. 84-1 at 1276.)  This policy explains that "[a] dual job scenario is when a tipped server is asked to perform nontipped work that does not relate to their primary duty (cleaning bathrooms, washing windows or other maintenance work or requiring a server to wear headset or take drive-thru orders.[)]" (*Id.*)  The policy requires that "[i]f a server performed any maintenance work or other non-tipped work, they must receive the minimum wage during this time." (*Id.*)  It also clarifies that "[d]ual job duties does not include post shift side work assignments such as rolling silverware or cleaning section." (*Id.*)  Lastly, the policy states that "[p]ost shift side work assignments cannot exceed 20% of his/her shift." (*Id.*)

Steak N Shake required servers to acknowledge Steak N Shake's "Clock In-Clock Out Policy." (*See* Doc. No. 86 at 1744.)  In relevant part, this policy states:

> I acknowledge that when I work as a Server, I am a "tipped employee" under the Fair Labor Standards Act (FLSA) and when I work any other position I am not a "tipped employee."  I agree that I will clock in under the job code that 100% reflects the job function I am performing and, whenever I work as a Server, I will report/declare 100% of the tips received at the end of my shift.

> If asked to perform a "dual job", it is your responsibility to "clock out" of your Server role and immediately "clock in" at your production rate (i.e.[,] an hourly minimum wage rate).  If prior to performing a "dual job" you forget or otherwise fail to "clock out" of your Server rate and immediately "clock in" to your production rate, you must notify your Manager, Restaurant Manager or General Manager to ensure you are paid correctly for every minute you spend working a "dual job."  You must never work even one minute of a "dual job" unless you are clocked in correctly at the applicable minimum wage rate.  If instructed to perform a "dual job" while still on your Server rate, you must refuse to perform the "dual job" and instead immediately notify your Manager, Restaurant Manager, District Manager, Division President or Human Resources Manager.

(Doc. No. 86-1 at 1771-72.)[3]

---

[3] In its opposition, Steak N Shake relied on an affidavit from Rebekah Nevin, who has served as a server, manager, restaurant manager, general manager and Training General Manager for Steak

Plaintiffs and managers testified that servers were not able to clock themselves in at the full minimum wage rate.  (Doc. No. 84-7 at 1579-80, 1587; Doc. No. 84-3 at 1338, 1350; Doc. No. 86-2 at 1815, 1842; Doc. No. 84-8 at 1646; *cf* Doc. No. 84-5 at 1493 (testifying servers would clock in at the full minimum wage rate).)  Instead, servers relied on managers to clock them in at the appropriate rate as necessary.  (*See* Doc. No. 84-7 at 1579-80, 1587; Doc. No. 84-3 at 1338, 1350; Doc. No. 86-2 at 1815, 1842; Doc. No. 84-8 at 1646.)  In some instances, Plaintiffs were not aware they needed to clock in at a different rate depending on the tasks they were performing.  (*See* Doc. No. 84-8 at 1657.)  At other times, Plaintiffs testified they were unable to clock in at the appropriate rate either because a manager was not available, or a manager denied their request to change rates.  (Doc. No. 84-7 at 1579-80, Doc. No. 84-3 at 1339, Doc. No. 84-8 at 1646, 1657.)  According to managers, some servers chose not to clock in at a higher rate while performing unrelated work because they felt it took too much effort.  (Doc. No. 84-3 at 1338-39.)

Managers testified that if a server performed dual jobs, it was their practice and Steak N Shake policy to either clock servers in at the appropriate rate themselves or make alterations in Steak N Shake's timekeeping software after a shift.  (*Id.* at 1339, 1349-50; Doc. No. 86-2 at 1793, 1843-44; *see also* Doc. No. 84-5 at 1492, 1503; *cf* Doc. No. 84-8 at 1657.)  At the same time, managers testified that they did not track "non-tipped side work" as part of their practice or pursuant to a Steak N Shake policy to ensure tip-supporting work did not exceed 20% of a

---

N Shake.  (Doc. No. 86-1.)  Attached to Ms. Nevin's affidavit is a copy of Steak N Shake's policies.  (*See id.*)  Plaintiffs argue that because Ms. Nevin was "never identified by Defendant in its disclosures," these documents cannot be used in response to a motion for summary judgment. (Doc. No. 90 at 1954 (citing *Emanuel v. Cnty of Wayne*, 652 F.App'x 417, 423 (6th Cir. 2016)).) The Court notes that Plaintiffs have not moved to strike this document and that these policies were previously filed and considered at the motion for certification stage.  (*See* Doc. No. 46-1 at 859-64; *see* Doc. No. 56 at 994, 998 (citing Nevin Affidavit).)

server's shift.  (Doc. No. 86-2 at 1836; Doc. No. 84-4 at 1427-28, 1430-31; Doc. No. 84-3 at 1356-58.)

Managers observed servers performing maintenance or other non-tip generating work while being paid the tipped minimum wage rate.  (*See* Doc. No. 84-3 at 1358 (Manager Sharon Leone testifying that servers were not paid at the full minimum wage when they performed maintenance work); *id.* at 1344, 1368 (testifying servers were paid at the tipped rate when making milkshakes and doing dishes); *see also* Doc. No. 84-4 at 1426 (Manager April Norris-Nelson testifying servers were paid the tipped wage when cleaning bathrooms); *id.* at 1428 (testifying servers were paid the tipped rate when sweeping and mopping, polishing stainless steel, and wiping down walls).)  Plaintiffs corroborated this testimony.  (*See* Doc. No. 84-7 at 1597-98 (Plaintiff Emily Harding testifying she was paid at the tipped rate while completing unrelated work); *id.* at 1580 (describing "making milkshakes . . . cleaning bathrooms . . . running silverware . . . doing dishes . . . sweeping and mopping" while "getting paid as a server"); Doc. No. 84-8 at 1657, 1658 (Plaintiff Michele Phillips testifying she was paid the tipped minimum wage while cleaning bathrooms and training servers).)

### 3.  **Plaintiffs' Expert Testimony**

Plaintiffs introduced expert testimony from Dr. Liels Fox.  (*See* Doc. No. 84-6.)  Dr. Fox had access to payroll data that included server identification numbers, clock-in dates and times, clock-out dates and times, hourly rates of pay, job titles, and total hours worked.  (*Id.* at 1550-51.)  Dr. Fox also had access to point of sale data that contained server identification numbers and the times orders were opened and closed.  (*Id.* at 1551.)  By comparing these sets of data, Dr. Fox concluded that Plaintiffs "all worked at least one week where more than 20% of the time they spent at work for Steak N Shake was without customers and, therefore, without the

opportunity to earn tips from customers." (*Id.* at 1549.)  Dr. Fox further opined that "during those periods of time, Steak N Shake paid each Plaintiff and Opt-In Plaintiff at a rate that was less than both the federal minimum wage and the Ohio minimum wage." (*Id.* at 1549-50.)

### B. Procedural History

Plaintiff Betsy Ramos filed this suit on June 21, 2021, bringing one count for violation of the Ohio Minimum Fair Wage Standard Act for failure to pay the minimum wage, and one count for violation of the Fair Labor Standards Act for failure to pay the minimum wage. (*See* Doc. No. 1.)  On July 21, 2021, Plaintiff filed an amended complaint, adding Emily Harding as a Plaintiff.  (Doc. No. 7.)  On August 5, 2021, Plaintiff sought leave to file a second amended complaint (Doc. No. 15), which the Court granted on September 20, 2021.  (September 20, 2021 Order.)

On December 15, 2021, Plaintiff filed a motion for conditional certification of a FLSA collective of similarly situated employees.  (Doc. No. 37.)  On February 11, 2022, this Court granted conditional certification of a FLSA collective comprised of: "[a]ll current and former tipped employees who worked for Defendant for at least one week in Ohio during the three-year prior to the date the Court grants conditional certification to the present." (Doc. No. 56 at 999.)  On March 3, 2022, Plaintiff filed a motion to modify the consent form (Doc. No. 60), which the Court granted on March 10, 2022.  (March 10, 2022 Order.)  During the 60-day opt-in period, Plaintiff filed numerous consent forms.  (*See* Doc. Nos. 64-75.)  In total, the opt in class is "approximately 124 Plaintiffs." (Doc. No. 90 at 1966.)  Steak N Shake did not file a motion to decertify the collective action.

On March 31, 2023, Plaintiffs filed a motion for partial summary judgment on liability for their FLSA claim.  (Doc. No. 83.)  Steak N Shake filed its response in opposition on May 1, 2023 (Doc. No. 86), and Plaintiffs filed a reply on May 22, 2023.  (Doc. No. 90.)

### C.  Statutory Background

Congress enacted the Fair Labor Standards Act ("FLSA") in 1938 "in response to national concern that the price of American development was the exploitation of an entire class of low-income workers."  *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 615 (9th Cir. 2018).  To protect workers, the FLSA requires that employers pay their employees at least $7.25 per hour.  *See* 29 U.S.C. § 206(a)(1)(C).  In 1966, the FLSA was amended to define "tipped employee" and "provide, for the very first time, a formula for calculating a tipped employee's wages."  *Rafferty v. Denny's Inc.*, 13 F.4th 1166, 1180 (11th Cir. 2021).  This amendment established an exception to the minimum wage for employees who regularly receive more than $30 a month in tips.  *See* 29 U.S.C. § 203(t).  As a result, employers may claim a "tip credit" that allows them to pay tipped employees $2.13 per hour under certain circumstances.  *See* 209 U.S.C. § 203(m).

The following year, the Department of Labor ("DOL") began "promulgat[ing] a series of regulations to implement the tip credit."  *Haase v. Cameron Mitchell Rests., LLC*, No. 2:23-cv-1316, 2024 WL 23159, at *2 (S.D. Ohio Jan. 2, 2024).  In January 1967, "the DOL issued a notice of proposed rulemaking aimed at 'expand[ing] 29 CFR Part 521 to make provisions responsive' to the 'Fair Labor Standards Act of 1966,' specifically the newly amended sections" regarding tipped employees.  *Marsh*, 905 F.3d at 621 (quoting 32 Fed. Reg. 222, 222 (Jan. 10, 1967)).  In September 1967, the DOL promulgated this rule, with an additional subsection addressing dual jobs.  *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 878 (8th Cir. 2011) (citing 32

Fed. Reg. 13,575, 13580-81 (Sept. 28, 1967)); *see also Rafferty*, 13 F.4th at 1181 (noting that the notice of proposed rulemaking "did not specifically mention the dual jobs regulation").

The dual jobs regulation, found in C.F.R. § 531.56(e), "distinguished between someone who worked two distinct jobs (e.g., working as a server and as a maintenance employee), and someone who worked only one job but had overlapping duties (e.g., a server who spends some time cleaning tables)." *Haase*, 2024 WL 23159 at *2 (citing 29 C.F.R. § 531.56(e) (1967 version)).  For an employee with two distinct jobs, employers could not claim a tip credit for the time the employee worked in the non-tipped position.  *Id.*  For employees who worked one job with overlapping duties, employers could claim a tip credit for time spent on "related duties" even if those duties were not "by themselves [] directed toward producing tips."  *Id.*

In 1988, the DOL issued a guidance interpreting the dual jobs regulation in its Field Operations Handbook ("Handbook," "FOH" or "1988 Guidance").  *Id.*  This guidance created two rules.  First, an employer may not claim a tip credit for time an employee spent on duties that were unrelated to the tipped occupation.  Second, an employer may claim a tip credit for time an employee spent performing duties related to the tipped occupation so long as "those duties were not performed by that employee for more than twenty percent of her working hours." *Id.* (citing *Rafferty*, 13 F.4th at 1175.); *see also* FOH § 30d00(f)(2016).  This interpretation became known as the "80/20 rule."  *Rafferty*, 13 F.4th at 1175.

In 2018, the DOL rescinded the 80/20 rule by "jettison[ing] any limitation on the amount of duties related to a tip-producing occupation" through an opinion letter ("2018 Letter" or "Letter").  *Haase*, 2024 WL 23159 at *2 (quoting *Rafferty*, 13 F.4th at 1176).  Under the 2018 Letter, so long as the tipped employee performed "duties related to a tip-producing occupation" contemporaneously with "direct customer-service duties," an employer may claim a tip credit on

all time spent performing tip related duties.  *Id.*  The 2018 Letter also refers employers to the

Occupation Information Network ("O*NET"), which is "an online database of work attributes

and job characteristics," to determine "which duties are related to a tipped occupation."  *O'Neal*

*v. Denn-Ohio*, No. 3:19-cv-280, 2020 WL 210801, at *5 (N.D. Ohio Jan. 14, 2020).

In 2021, the DOL promulgated a new dual jobs rule.  *See* C.F.R. § 531.56.  Under this

rule, employers may claim a tip credit for "work that is part of the tipped occupation."  *See*

C.F.R. § 531.56(f).  Work that is part of the tipped occupation includes both "work that produces

tips; and work that directly supports the tip producing work, if the directly supporting work is not

performed a substantial amount of time."  29 C.F.R. § 531.56(f)(1).  The 2021 rule defines

"substantial amount of time" as exceeding a 20% of a workweek or 30 continuous minutes.  29

C.F.R. § 531.56(f)(4).

The 2021 rule provides illustrative, but not exhaustive, examples of tip-producing work,

directly supporting work, and work that is not part of the tipped occupation in the context of

servers.  *See* 29 C.F.R. § 531.56(f).

- "A server's tip-producing work includes providing table service, such as taking orders, making recommendations, and serving food and drink."  29 C.F.R. § 531.56(f)(2)(ii).

- "A server's directly supporting work includes dining room prep work, such as refilling salt and pepper shakers and ketchup bottles, rolling silverware, folding napkins, sweeping or vacuuming under tables in the dining area, and setting and bussing tables."  29 C.F.R. § 531.56(f)(3)(ii).

- Examples of work that is not part of the tipped occupation for servers include "preparing food, including salads, and cleaning the kitchen or bathrooms"  29 C.F.R. § 531.56(f)(5)(ii).

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the

part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or 'weigh' conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

## III.    ANALYSIS

### A. *Mt. Clemens* Burden Shifting Framework

The parties dispute whether the burden shifting framework discussed in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) applies to Plaintiffs' motion for partial summary judgment on liability.  (*See* Doc. No. 84 at 1262-63; *see also* Doc. No. 86 at 1756.)

An employee who brings a suit for unpaid minimum wages "has the burden of proving that he [or she] performed work for which he [or she] was not properly compensated." *Mt. Clemens*, 328 at 686-87.  If an employer has "kept proper and accurate records" an employee "may easily discharge his [or her] burden by securing the production of those records." *Id.* at 687.  If an employer has not kept proper and accurate records, *Mt. Clemens* discussed the proper allocation of the burden of proof:

> [W]here the employer's records are inaccurate or inadequate . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to

produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.*

This burden shifting framework "do[es] not lessen the standard of proof for showing that an FLSA violation occurred" and "does not help plaintiffs show that there was a violation under the FLSA." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 602-03 (6th Cir. 2009), abrogated on other grounds by *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016). Instead, *Mt. Clemens* merely "gives a FLSA plaintiff an easier way to show what his or her damages are." *Id.*

At this stage, the Court need not apply this framework because Plaintiffs' motion for summary judgment only concerns liability, not damages. (Doc. No. 83 at 1237-38 ("Plaintiffs do not move for summary judgment on [] damages").)[4]

### B.  The Applicable Regulations and Guidance

The parties do not discuss which DOL rules and guidance apply to this case. From their briefing, it appears both parties apply a combination of the 1967 regulation, the 80/20 rule, and the 2021 regulation. (*See* Doc. No. 84 at 1246, 1251; Doc. No. 86 at 1747-49.)

Under the Supreme Court's decision in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), courts deferred to "'permissible' agency interpretations of the statutes those agencies administer—even when a reviewing court reads the statute differently." *Loper v. Bright Enters. v. Raimondo*, 603 U.S. –, 2024 WL 3208360, at *6 (June 28, 2024). The Supreme Court's recent decision in *Loper Bright* overruled *Chevron*, holding that the "deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA [Administrative Procedure Act]." *Id.* at *14. Accordingly, the Court will not

---

[4] If the issue of damages comes before the Court, the parties may re-brief the applicability of the *Mt. Clemens* framework.

afford deference under *Chevron* to the Department of Labor's regulations and interpretations of the FLSA. *Loper Bright* makes clear that *Skidmore* deference is the appropriate standard to evaluate agency regulations. *See* 2024 WL 3208360 at * 17; *see also id.* at *51 (J. Kagan dissenting) ("[T]he majority makes clear that what is usually called *Skidmore* deference continues to apply."). In contrast, *Loper Bright* does not opine on whether *Auer* deference is consistent with the APA. Therefore, the Court will analyze whether these regulations and interpretations are entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and *Auer v. Robbins*, 519 U.S. 452 (1997) where appropriate. *See id.* (citing *Kisor v. Wilkie*, 558 U.S. 558 (2019)).

### 1. 1967 Dual Jobs Regulation

Under *Loper Bright* and the APA, the Court must conduct an independent judgment to decide whether the Department of Labor was acting within its statutory authority when it promulgated the 1967 dual jobs regulation. 2024 WL 3208360 at *22.[5] The Court may "seek aid from the interpretations of those responsible for implementing particular statutes." *Id.* at *13. These interpretations are useful to the Court insofar as they "'constitute a body of experience and informed judgment'" that "may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'" *Id.* at *13, *17 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n.8 (1983)).

---

[5] Before *Loper Bright*, courts analyzed deference to the 1967 dual jobs regulation under *Chevron*. Indeed, the Ninth Circuit in *Marsh*, 905 F.3d at 621 and the Eighth Circuit in *Fast*, 638 F.3d at 876 both found that this regulation was entitled to *Chevron* deference. The Sixth Circuit did not have occasion to consider whether the 1967 dual jobs regulation should receive *Chevron* deference. Two recent decisions in the Southern District of Ohio also found that this regulation was entitled to *Chevron* deference. *See Haase*, 2024 WL 23159, at *2; *see also Toro v. Calimira LLC*, No. 2:23-cv-28, 2024 WL 69578, at *2 (S.D. Ohio Jan. 5, 2024). As discussed above, these decisions and their reliance on *Chevron* are no longer good law, nor are they binding.

The Court will carry out its "ordinary job of interpreting statutes, with due respect for the views of the Executive Branch" by applying the framework laid out in *Skidmore*. *Id.* *Skidmore* offers a "measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012); *see also United States v. Mead Corp.*, 533 U.S. 218, 228 (6th Cir. 2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.").

Taking these factors into consideration, the Court finds that the 1967 dual jobs regulation is entitled to *Skidmore* deference and has the power to persuade.  The history of the regulation shows that it was promulgated after months of thorough consideration through the notice and comment process.  *See Fast*, 638 F.3d at 878 (citing 32 Fed. Reg. 13,575, 13580-81 (Sept. 28, 1967)); *see also Rafferty*, 13 F.4th at 1181.  The reasoning behind this regulation is valid: to implement the 1966 amendments to the FLSA, including the newly created tip credit.  *Marsh*, 905 F.3d at 621 (quoting 32 Fed. Reg. 222, 222 (Jan. 10, 1967)).  The dual jobs regulation is consistent with Congress's pronouncement of the need for a tipped minimum wage.  *Id.* at 626. Likewise, the Department of Labor's later pronouncements have "continuously endeavored to provide employers with future guidance on the regulation in the form of opinion letters," which ultimately "culminated in the creation of the Guidance in the DOL's Field Operations Handbook[] in 1988."  *Id.*  Because it has the power to persuade under *Skidmore*, the Court will apply the 1967 dual jobs regulation to the issues in this case.

### 2. 80/20 Rule

Next, the Court will consider what deference, if any, to grant the 80/20 rule in the DOL's Handbook. The Sixth Circuit has made clear that because the Handbook was "not subject to the rigors of the Administrative Procedure Act, including notice and comment," it was not entitled to deference under *Chevron*. *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 531-32 (6th Cir. 2017). For agency interpretations that have not undergone notice and comment, courts may still defer to an agency under *Auer* if certain conditions are met. *Kisor*, 588 U.S. at 586. However, in both instances where the Sixth Circuit has considered deference to the Handbook, the Sixth Circuit has analyzed the Handbook's persuasive authority under *Skidmore* without also addressing *Auer* deference. *See Stein*, 873 F.3d at 531-32; *see also Myers v. Copper Cellar Corp.*, 192 F.3d 546, 544 (6th Cir. 1999).

As a result, some district courts have questioned "whether the Sixth Circuit ever gives *Auer* deference to DOL guidance—like the 1988 Guidance—contained in the Field Operations Handbook" and if it "should instead be considered persuasive authority." *Haase*, 2024 WL 23159 at *6-7. The Handbook itself offers some insight on this issue. In *Matusky v. Avalon Holdings, Corporation*, this court observed that the Wage and Hour Division of the DOL states that the Handbook "is not used as a device for establishing interpretative policy." 379 F.Supp.3d 657, 668-69 (N.D. Ohio 2019) (citing https://www.dol.gov/whd/foh/); *see also Harrison v. Rockne's Inc.*, 275 F.Supp.3d 706, 713 (N.D. Ohio 2017) (observing that the preface of the Handbook states that "[i]t is not used as a device for establishing interpretative policy"). Accordingly, by its own description, the Handbook is not an official interpretation of a DOL

regulation that would warrant *Auer* deference.[6]  Instead, this court has previously found that "because [the Handbook] is meant to guide DOL employees in the investigation and enforcement of the dual jobs regulation, it is persuasive evidence of the DOL's intent and should be considered."  *Harrison*, 274 F.Supp.3d at 713.

As such, the Court will assess whether the 80/20 rule found in the 1988 Handbook is a persuasive authority under *Skidmore*.  While discussing a different provision of the Handbook, the Sixth Circuit has held that the Handbook and DOL opinions are "persuasive, not only because they demonstrate that the DOL has maintained a consistent position for decades, but also because their reasoning demonstrates that the DOL considered the legality of these provisions in light of the" relevant regulations.  *See Stein*, 873 F.3d at 533 (discussing impermissible draw policies and overtime violations).  The same reasoning applies to the 80/20 rule.  As the culmination of the DOL's efforts to "provide employers with further guidance and regulation," *Marsh*, 905 F.3d at 626, the Handbook is consistent with DOL's earlier pronouncements.  *See Christopher*, 567 U.S. at 159.  Moreover, the 80/20 rule has been the DOL's position for decades,[7] as evidenced by the DOL's multiple amicus briefs defending the rule.  *O'Neal*, 2020 210801, at *5; *see also Haase*, 2024 WL 23159 at *7 (holding that the Handbook is a "fair and considered judgment" that "certainly falls within the DOL's substantive expertise").

---

[6] Despite this language, the Ninth Circuit in *Marsh*, and the Eighth Circuit in *Fast* have both held that the 80/20 rule was entitled to deference under *Auer*.  As the District of Maryland observed in *Barnhart v. Chesapeake Bay Seafood House Associates, L.L.C.*, "the majority of courts have considered the [Handbook's] construal of the 'dual jobs' regulation have deferred to the DOL's interpretation and recognized plaintiffs' claims under FLSA based on the 20% limitation."  No. JFM-16-01277, 2017 WL 1196580, at *6 (D. Md. Mar. 31, 2017).

[7] There have been a few, brief periods during which the DOL has not followed the 80/20 rule. *See Rafferty*, 13 F.4th at 1175.  Nonetheless, the DOL has remained consistent in its position for the vast majority of several decades.  *See Haase*, 2024 WL 23159 at *7 n.5.

The Court finds that the 1988 Handbook and the 80/20 rule are persuasive authorities and will apply them to the issues in this case.

### 3. 2018 Letter

Next, the Court will undertake a similar analysis with respect to the DOL's 2018 Letter rescinding the 80/20 rule. Though the Sixth Circuit has not considered this issue, the Court has the benefit of previous analysis by another judge in this district.

In *O'Neal v. Denn-Ohio*, Judge Helmick found that the DOL's 2018 Letter was not entitled to *Auer* deference. 2020 WL 210801, at *6. To determine if an agency's interpretation is entitled to *Auer* deference, the Court applies the three-part test laid out in *Kisor v. Wilkie*, 588 U.S. at 573-76. First, the court determines whether the regulation is genuinely ambiguous. *Id.* at 573. If it is, the court next decides whether the agency's interpretation of the regulation is reasonable. *Id.* at 574-76. And lastly, the court "make[s] an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 576.

At step one, *O'Neal* found that the dual jobs regulation is ambiguous because it did not define "related duties" or "how much time is 'part of [the] time' or occasionally." 2020 WL 210801, at *6. Likewise, the court found "nothing in the structure, history or purpose of the regulation that resolves this ambiguity." *Id.*

Next, *O'Neal* found that the 2018 Letter's interpretation of the dual jobs regulation was unreasonable "because it would lead to results inconsistent with the purpose of the dual jobs regulation." *Id.* The Court identified conflict between the Letter's statement that "[w]e do not intend to place a limitation on the amount of duties related to a tip-producing occupation that may be performed, so long as they are performed contemporaneously with direct customer-

service duties and all other requirements of the act are met," and the text of the dual jobs regulation. *Id.* Additionally, the Letter's reliance on O*NET also rendered this interpretation unreasonable because O*NET is generated in part by "asking employees which tasks their employers are requiring them to perform." *Id.* at *7. Therefore, "[i]f employers assign tipped employees duties traditionally performed by non-tipped employees, the O*NET definitions will reflect this and the protections established by the dual jobs regulation will erode." *Id.*

At the third step of the *Auer* analysis, *O'Neal* held that the 2018 Letter is not entitled to deference "given [its] 'character and context.'" *Id.* First, this guidance "represents a stark change from the approach the DOL adhered to for decades." *Id.* Second, the timing "further cast doubt on its interpretive integrity." *Id.* Specifically, the Letter "came mere months after the Restaurant Law Center and Texas Restaurant Association filed suit against the DOL, challenging its authority to implement the dual jobs regulation." *Id.* (citing *Rest. L. Ctr. v. Dep't. of Labor*, No. 1:18-cv-00567, 2018 WL 3374109 (W.D. Tex. July 6, 2018)). In sum, the 2018 Letter resembled a "convenient litigation position" that was not entitled to *Auer* deference. *Id.*

*O'Neal* is not alone in questioning whether the 2018 Letter is entitled to *Auer* deference. *See Goeble v. Burntwood Tavern Holdings, LLC*, No. 1:22-cv-1733, 2023 WL 3092645, at *2-3 (N.D. Ohio Apr. 26, 2023) (discussing reasons to question 2018 guidance); *see also Matusky*, 379 F.Supp.3d at 669 (holding that the 2018 Letter is "is inconsistent with the plain language of the FLSA and related DOL regulations in that it focuses on an employee's individual duties instead of her overall occupation. Both the FLSA and the DOL regulations are written in terms of 'occupation' as opposed to 'duty'"); *Callaway v. DenOne LLC*, No. 1:18-cv-1981, 2019 WL 1090346, at *2 (N.D. Ohio Mar. 8, 2019) (questioning whether 2018 Letter warrants *Auer* deference). Likewise, other courts in this circuit have found that the 2018 Letter is not entitled to

*Auer* deference.  *See Haase*, 2024 WL 23159 at *7-8; *see also Toro*, 2024 WL 69578 at *2;
*Roberson v. Texas Roadhouse Mgmt. Corp.*, No. 3:19-v-628, 2020 WL 7265860, at *5 (W.D.
Ky. Dec. 10, 2020).

In *Rafferty v. Denny's Inc.*, the Eleventh Circuit also held that the 2018 Letter should not
receive *Auer* deference for many of the same reasons discussed in *O'Neal*.  13 F.4th at 1179.  At
step one, the Eleventh Circuit noted that the dual jobs regulation is ambiguous because it "sets
out no test, definition, or other analytic tools to allow a court to ascertain what constitute
'related' duties and what do not and what demarcates a separate 'occupation.'"  *Id.* at 1180
(citing *Fast*, 638 F.3d at 877 and *Marsh*, 905 F.3d at 624).

Next, *Rafferty* held that the Letter is not a reasonable interpretation of the dual jobs
regulation because "[t]he removal of any limit on the time a tipped employee may perform non-
tipped duties flatly contradicts the dual-jobs regulation's ceiling on related duties at
'occasional[]'—or infrequent."  *Id.* at 1185.  Additionally, the 2018 Letter's reliance on O*NET
to define related duties "creates a risk that unlawful practices will become entrenched in high-
violation industries by setting up a fox-guarding-the-henhouse situation."  *Id.*

At step three, *Rafferty* found the character and context of the Letter did not entitle this
interpretation to controlling weight.  *Id.* at 1186.  First, in 2009 the DOL "previously adopted
[this interpretation] and then abandoned [it] shortly after."  *Id.*  Second, the DOL's notice of
proposed rulemaking "betrays an absence of 'fair and considered judgment' on the part of the
Department" because it "lacked any data to quantify any potential costs, benefits, or transfers
which may be associated with the implementation of its policy."  *Id.* (citing 84 Fed. Reg. 53956-
01, at 59367).  Third, the Letter "contradicts the Department's long-standing prior

interpretation." *Id.* at 1187 (citing *Kisor*, 139 S.Ct. at 2418). Fourth, applying the 2018 Letter

"would unfairly surprise regulated parties." *Id.*

In total, the majority of district courts that considered the 2018 Letter have found that it is

not entitled to *Auer* deference. *See Flores v. HMS Host. Corp.*, No. 8-18-cv-03312, 2019 WL

5454647 at *7 (D. Md. Oct. 23, 2019) (collecting cases); *see also Rest. L. Ctr. v. U.S. Dep't of

Labor*, No. 1:21-cv-1106, 2023 WL 4375518, at *2 (W.D. Tex. July 6, 2023) (noting the 2018

Letter was "met with near-universal rejection").[8]

For the reasons above, the Court agrees with *O'Neal* and *Rafferty* and holds that the 2018

Letter is not entitled to deference under *Auer*. However, declining to defer under *Auer* does not

foreclose the possibility that the 2018 Letter could receive *Skidmore* deference.

In *O'Neal*, the court held that "[f]or reasons similar to those discussed in the *Auer*

deference portion of this opinion," the 2018 Letter was not entitled to *Skidmore* deference. 2020

WL 210801 at *7-8. Specifically, *O'Neal* noted that the 2018 Letter "flies in the face of decades

of DOL interpretations and applications of the dual jobs regulation that used an entirely different

analytical framework." *Id.* at *8. The court noted that the stated purpose of resolving ambiguity

"may be a noble goal, but the DOL does not provide any reasons for resolving it with this

interpretation, rather than, for example, its previous bright-line rule regarding related duties." *Id.*

*Rafferty* also considered whether the Letter was entitled to *Skidmore*, holding that "[a]s the *Auer*

analysis shows, the 2018 Opinion letter fails this evaluation on all fronts." *Id.*

---

[8] The Court identified only one case that followed the 2018 Letter's interpretation. *See Shaffer v. Perry's Rests. Ltd.*, No. SA-16-CA-1193-FB, 2019 WL 2098116 (W.D. Tex. Apr. 24, 2019). However, that decision resulted from the plaintiffs' failure to object to the magistrate judge's report and recommendation. *See Shaffer v. Perry's Restaurants, Ltd.*, No. SA-16-CA-1193-FB, 2020 WL 13064709, at *1 (W.D. Tex. Feb. 20, 2020) (adopting report and recommendation to deny motion for reconsideration).

Accordingly, for the same reasons discussed in the Court's *Auer* analysis, the 2018 Letter is not entitled to *Skidmore* deference.  Because the Letter is not entitled to *Auer* deference, nor is it a persuasive authority, the Court will not apply it to Plaintiffs' FLSA claim.

### 4.  2021 Regulation

The 2021 Regulation came into effect in December 2021.  *See* 29 C.F.R. § 531.56 (effective December 28, 2021).  Plaintiffs acknowledge that it is "an open issue as to whether this new regulation is retroactive."  (Doc. No. 84 at 1246 n.1.)  Plaintiffs state they "do not seek summary judgment on the issue of whether the 2021 amendments to the Dual Jobs Regulation are retroactive."  (*Id.*)

In general, "retroactivity is not favored in the law," and "courts should not construe 'congressional enactments and administrative rules . . . to have retroactive effect unless their language requires this result.'"  *BellSouth Telecomms., Inc. v. Southeast Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006).  Plaintiffs have not pointed to any language in the 2021 regulation that requires retroactive effect.  As such, the Court will not apply the 2021 regulation to Plaintiffs' claims.

### 5.  Applicable Regulation and Guidance

Having completed the analysis above, the Court will apply the 1967 dual jobs regulation and the 80/20 rule to Plaintiffs' FLSA claim.  *See Toro*, 2024 WL 69578, at *3 ("To sum up, only the 1967 Regulation and 1988 Guidance govern Plaintiff's FLSA claim.").  The Court will not apply the 2018 Letter or the 2021 regulation.

Applying these standards, two rules emerge.  First, Steak N Shake may not claim a tip credit for time its servers performed unrelated work.  Second, Steak N Shake may claim a tip

credit for time servers performed tip-supporting work so long as tip-supporting work did not

exceed 20% of a server's working hours.

### C.  Plaintiffs' FLSA Claims

#### 1.  Unrelated Work

"The dual job analysis turns on whether the employee's untipped duties are 'related' to

the tipped occupation and how often they are performed."  *Harrison*, 274 F.Supp.3d at 710

(citing *Osman v. Grube, Inc.*, No. 16-cv-802, 2017 WL 2908864 (N.D. Ohio July 7, 2017)).  "A

server required to do maintenance work was 'effectively employed in dual jobs.'"  *Goeble*, 2023

WL 3092645 at *3 (citing *Harrison*, 274 F.Supp.3d at 712); *see also Rafferty*, 13 F.4th at 1189

"[T]ypical maintenance duties are not related to a server's duties.").  Furthermore, tasks like:

> working the grill line and performing the primary job duties of cook; performing
> the primary job duties of a host or hostess; taking out trash; scrubbing walls;
> sweeping and mopping floors; cleaning booths; operating the dishtank and
> performing the primary job duties of a dishwasher; breaking down and cleaning the
> server line; ensuring the general cleanliness for the front of the house; detail
> cleaning throughout the restaurant; stocking stations throughout the restaurant;
> stocking ice; preparing delivery orders Uber Eats, Grub Hub and Door Dash;
> preparing takeout orders and online orders from Denny's.com; answering the
> phone; working the cash register; greeting and seating customers; preparing salads;
> preparing deserts, ice creams and milkshakes; cutting lemons, limes, melons and
> strawberries; washing and stocking unsliced fruits; baking biscuits; preparing
> specialty drinks such as lemonades, limeades and teas; and rolling bins full of
> silverware

are unrelated to serving.  *O'Neal*, 2020 WL 210801 at *8-9; *see also Rafferty*, 13 F.4th at 1189

(contrasting related duties that "have to do with single-step, easily executed food and drink

preparations or readying serving items, such as silverware, plates, and dishes for customers'

immediate use" with unrelated duties like maintenance, cooking, and dishwashing).

Plaintiffs have demonstrated that they performed tasks unrelated to serving.  Specifically,

Plaintiffs have introduced policies showing that servers were assigned "daily sidework duties"

and tasks that included cleaning various parts of the restaurant.  (*See* Doc. No. 84-1 at 1278-84,

1285-86.)  Testimony from Steak N Shake managers established that Plaintiffs were expected to and did perform these duties, in addition to other cleaning tasks and food preparation.  (*See* Doc. No. 84-3 at 1338, 1344, 1353, 1357-58, 1363, 1365;  *see also* Doc. No. 86-2 at 1793, 1850; Doc. No. 84-4 at 1410-11, 1425, 1428.)  Plaintiffs Emily Harding and Michele Phillips also testified that they performed work that was unrelated to their tipped occupation as servers.  (*See* Doc. No. 84-7 at 1580, 1584, 1597-98, 1599; *see also* Doc. No. 84-8 at 1631-32,1655-57.)

As for how often Plaintiffs performed these tasks, Plaintiffs are required to show "more than de minimis claims based on seconds or minutes spent" performing unrelated tasks.  *Marsh*, 905 F.3d at 631; *see also Shaefer v. Walker Bros. Enters., Inc.*, 829 F.3d 551, 555 (7th Cir. 2016) ("[T]he possibility that a few minutes a day were devoted to keeping the restaurant tidy does not require the restaurants to pay the normal minimum wage rather than the tip-credit rate for those minutes.").  The fact that these tasks were listed as part of servers' daily duties and responsibilities on Steak N' Shake's corporate policies shows that Plaintiffs' performance of unrelated tasks exceeded "the occasional request" and was instead part of a "continuous practice" that occurred each shift.  *Marsh*, 905 F.3d at 631.  (*See also* Doc. No. 84-3 at 1338, 1353, 1357-58, 1344, 1363, 1365; Doc. No. 86-2 at 1793, 1850, 1793, 1850; Doc. No. 84-4 at 1410, 1425, 1428, 1411.)  Furthermore, managers also testified that a task like cleaning the bathrooms could take between fifteen minutes to one hour, exceeding the de minimis threshold discussed in *Marsh*.  (*See* Doc. No. 84-3 at 1363.)

Next, Plaintiffs bear the burden of establishing that they were improperly compensated for time spent performing unrelated work.  *Mt. Clemens*, 328 U.S. at 686-87.  The evidence on the record established that Plaintiffs received the tipped minimum wage while performing unrelated work.  (*See* Doc. No. 84-3 at 1358, 1344, 1368; *see also* Doc. No. 84-4 at 1426, 1428;

Doc. No. 84-7 at 1597-98, 1580; Doc. No. 84-8 at 1656-58.)  To be sure, the record also shows that at some, though not all, times Plaintiffs were paid the full minimum wage for time spent performing unrelated work.  (*See* Doc. No. 84-7 at 1588-89; *see also* Doc. No. 86-2 at 1844; Doc. No. 84-4 at 1408-09.)  However, these instances of proper compensation do not excuse the periods where Plaintiffs were not fully compensated for purposes of Steak N Shake's liability under the FLSA.

In opposition to Plaintiffs' motion, Steak N Shake argued that Plaintiffs' evidence does not represent all Ohio Steak N Shake locations but rather highlighted genuine issues of material fact.  (*See* Doc. No. 86 at 1750-56.)  These arguments are unpersuasive.  First, Plaintiffs' testimony is sufficient to establish class-wide liability because representatives testified "as to the means of enforcement of the common, FLSA-violating policy."  *Monroe v. FTS USA, LLC*, 860 F.3d 389, 408-09 (6th Cir. 2017) ("In FLSA cases, the use of representative testimony to establish class-wide liability has long been accepted.") *see also United States Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 781 (6th Cir. 1995) ("The testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees) (collecting cases).  Plaintiffs testified about common corporate policies, tasks, duties, and time keeping practices across Steak N Shake locations.  (*See e.g.*, Doc. No. 84-7 at 1599; Doc. No. 84-8 at 1656.)  Steak N Shake's corporate representative further testified that servers in different Steak N Shake locations followed the same policies and procedures and had the same primary responsibilities.  (Doc. No. 84-5 at 1490.)  Moreover, the parties agreed to a "representative discovery plan" following the close of the opt-in period.  (*See* Doc. No. 76 at 1206.)  Under this plan, Steak N Shake had the opportunity to depose certain Plaintiffs regarding their claims and

elicit testimony showing that Plaintiffs were not fairly representative employees. (*See id.*) *See also Cole Enters.*, 62 F.3d at 781.

Second, Steak N Shake's arguments do not raise issues of genuine material fact. Steak N Shake does not dispute that Plaintiffs performed cleaning tasks unrelated to their tipped occupation. (*See* Doc. No. 86 at 1753.) Steak N Shake does not dispute testimony that servers performed these tasks without being switched to the full minimum wage. (*See id.* at 1755 (asserting that "*some* deponents assert they monitored their servers' time and work tasks, and made sure to clock them out at the server rate and into their production ate when they were performing non-tipped work, if they were doing too much tip-supporting activity") (emphasis added); *cf.* Doc. No. 84-3 at 1358, 1344, 1368; *see also* Doc. No. 84-4 at 1426, 1428; Doc. No. 84-7 at 1597-98, 1580; Doc. No. 84-8 at 1657-58.) Steak N Shake does not dispute that Plaintiffs prepared food, operated the grill, and cleaned dishes during their shifts. Rather than dispute that Plaintiffs performed unrelated work while receiving the tipped minimum wage, Steak N Shake contests how often and for how long Plaintiffs performed these tasks. (*See* Doc. No. 86 at 1753-56.) Because Plaintiffs have cleared the "de minimis" threshold discussed in *Marsh* and *Shaefer*, the precise amount of time Plaintiffs spent on these tasks is relevant to a damages calculation, not liability. *See Mt. Clemens*, 328 at 686-87. Steak N Shake's arguments regarding Plaintiffs' motivations for doing these tasks are likewise unpersuasive. (*See* Doc. No. 86 at 1754-55.)[9]

---

[9] Plaintiffs' motivation for performing these tasks is not relevant to liability under the FLSA. Federal regulations state that "work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11; *see also* 29 C.F.R. § 778.223 (stating that "hours worked" includes "all time during which an employee is suffered or permitted to work whether or not he is required to do so"); *Callaway*, 2019 WL 1090346 at *3 (holding that the fact that the plaintiff "'took it upon herself' to make sure the restaurant was clean" did not negate a finding that the defendant

There is no genuine dispute of material fact that Steak N Shake claimed a tip credit for time its servers spent performing unrelated work in violation of the FLSA, the 1967 dual jobs regulation, and the 80/20 rule.  Accordingly, Plaintiffs' motion for summary judgment is granted with respect to their dual jobs claim.

## 2.  Tip-supporting Work

The parties do not dispute that Plaintiffs performed tip-supporting work like cleaning and setting tables, making tea and coffee, rolling and stocking silverware, stocking and refilling condiments, cleaning booths and the dining area, stocking paper supplies and drinks, mopping spills, and cleaning the dining area.  (*See* Doc. No. 84 at 1253-54; *see also* Doc. No. 86 at 1753-54; Doc. No. 90 at 1966; *see e.g.*, Doc. No. 84-3 at 1346-48, 1354-55, 1364; Doc. No. 84-4 at 1414, 1416-17, 1428, 1440, 1442-43; Doc. No. 84-5 at 1491-92, 1494; Doc. No. 84-7 at 1575, 1581; Doc. No. 84-8 at 1631-32, 1636-37, 1644, 1651.)  In contrast, the parties dispute how often and how long Plaintiffs performed these tasks.

The evidence on the record does not establish that Plaintiffs spent over 20% of their shifts performing tip-supporting work.  Starting with expert testimony, Dr. Fox testified that each Plaintiff "worked at least one week where more than 20% of the time they spent at work for Steak N Shake was without customers and, therefore, without the opportunity to earn tips from customers."  (Doc. No. 84-6 at 1449.)  Dr. Fox's report falls short of proving Plaintiffs' claim because it does not establish what type of work Plaintiffs *were* performing during these periods.

---

required her to perform sidework).  Steak N Shake permitted its servers to make milkshakes and clean silverware, and these tasks therefore constitute part of severs' compensable work.

Without more information, the Court cannot determine if Plaintiffs performed unrelated work, tip-supporting work, or even tip-generating work[10] when there were no open orders.

Plaintiffs' testimony also does not establish that they spent over 20% of their shifts on related, but non-tipped tasks. Plaintiff Emily Harding estimated that she spent 40-50% her shifts "doing things other than the serving duties." (Doc. No. 84-7 at 1580.) Likewise, Plaintiff Michele Phillips testified that she spent between 20-40% of her shifts performing "side work." (Doc. No. 84-8 at 1644, 1656.) By using the terms "things other than the serving duties" and "side work" to describe these tasks, Plaintiffs' testimony fails to differentiate between time they spent performing unrelated work (like working the grill or cleaning bathrooms) and time spent performing tip-supporting work (like rolling silverware or cleaning up spills). (*See* Doc. No. 84-1 at 1278-84 (using the term "side work" to describe both unrelated work and tip-supporting work); Doc. No. 84-4 at 1409-10, 1415-17 (testifying that servers' side work duties included unrelated work like cleaning bathrooms in addition to tip-supporting work).) This testimony may ultimately support Plaintiffs' claims but does not establish that Plaintiffs spent over 20% of their shifts on tip-supporting work.

Therefore, there is an outstanding dispute of material fact whether Steak N Shake improperly claimed a tip credit for time its servers performed tip-supporting work. Accordingly, summary judgment is not appropriate on this claim.

---

[10] Steak N Shake maintains that servers "routinely continued providing services to customers after they tabbed out; for example, refilling customers' drinks and giving them napkins." (*See* Doc. No. 86 at 1746 (citing Doc. No. 86-2 at 1862-63; Doc. No. 94-3 at 1352).)

**IV.**    <u>**CONCLUSION**</u>

For these reasons, Plaintiffs' motion for partial summary judgment (Doc. No. 83) is

GRANTED with respect to their claim for unrelated work and DENIED with respect to their

claim for tip-supporting work.

IT IS SO ORDERED.

Date:  August 15, 2024

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE